Erica C. Mirabella
MIRABELLA LAW, LLC
132 Boylston Street, 5th Floor
Boston, MA 02116
(617) 580-8270
(617) 583-1905 (fax)
erica@mirabellaLLC.com

Counsel for Plaintiffs
[Additional Counsel listed on signature page]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **RICHARD FERRARI**, individually and on behalf of all others similarly situated, | : |
| | :    Case No. |
| Plaintiff | : |
| | : |
| v. | : |
| | :    **CLASS ACTION COMPLAINT** |
| **VITAMIN SHOPPE, INC**., | : |
| | :    DEMAND FOR JURY TRIAL |
| Defendant. | : |

**INTRODUCTION**

This is a consumer class action brought on behalf of consumers who purchased

Bodytech Glutamine, Bodytech BCAA and Glutamine, and BodyTech Creatine & Glutamine

with Beta-Alanine dietary supplements ("the Products") from Vitamin Shoppe, Inc.

("Defendant" or "Vitamin Shoppe"). Vitamin Shoppe engaged in unfair and/or deceptive

business practices by misrepresenting the nature and quality of the Products on the Products'
labels, and was unjustly enriched.

## NATURE OF THE CASE

1.     Plaintiff brings this class action individually and on behalf of the Class defined
below against the Defendant to obtain relief, including among other things, damages and
injunctive relief. Plaintiff seeks redress for Defendant's manufacturing, marketing, promotion,
distribution and sale of its glutamine Products packaged and advertised as providing "Anti-
catabolic", "Muscle Growth", "Muscle Endurance", and "Muscle Recovery" benefits.

2.     Defendant advertises, manufactures, markets, sells and distributes the Products
throughout the United States, including in the State of Massachusetts.

3.     Defendant, like many companies in the bodybuilding supplemental industry,
ignore competent and reliable scientific data regarding their Products and ingredients.

4.     L-Glutamine ("L-Glutamine" and "Glutamine" as used herein are synonymous) is
the most abundant free amino acid found in human blood, and one of the individual building
blocks that join together to make up proteins in the body. Glutamine is made in the muscles and
is then distributed to various organs in the body via the bloodstream.

5.     Glutamine is considered "nonessential" because the human body produces its own
Glutamine.

6.     While Glutamine naturally found within the body plays a role in certain
mechanisms supporting muscle growth, recovery and immunity support, numerous scientific
studies have proven that use of Glutamine supplements provides no additional benefits to the
body.

7.     Many healthy people however, are under the impression, perpetuated by dietary supplement retailers like Vitamin Shoppe, that a supplemental intake of Glutamine has beneficial effects. This is frequently the case among athletes and bodybuilders, who commonly consume glutamine multiple times a day.

8.     Glutamine supplementation doses range from 2 to 40 grams per day, which represents 3% to 60% of the recommended intake of amino nitrogen.

9.     Basically, the ingestion of Vitamin Shoppe's Products do absolutely nothing for the recovery from exercise, recovery of muscle tissue or ability to decrease muscle wasting (anti-catabolic).

10.     Defendant intended for consumers to interpret these labels on its products as providing health benefits such as muscle recovery and immune support.

11.     Defendant is aware that these claims provide no added benefits to consumers.

12.     Plaintiff and Class members relied on Defendant's representations, and as a result of Defendant's failure to properly market and advertise its products, Plaintiff has suffered damages.

**PARTIES**

13.     Plaintiff Richard Ferrari is a citizen of the State of Massachusetts. At all relevant times to this matter, he resided, and continues to reside, in Beverly, Massachusetts. In December 2016, Plaintiff purchased Vitamin Shoppe's BodyTech Creatine & Glutamine with Beta-Alanine Dietary Supplement for his own use from a Vitamin Shoppe store in Peabody, Massachusetts for approximately $16.22.  In September 2015, Plaintiff purchased two containers of Vitamin Shoppe's BodyTech Creatine & Glutamine with Beta-Alanine Dietary Supplement for his own use from a Vitamin Shoppe store in Peabody, Massachusetts for approximately $19.99 each.

14.     Vitamin Shoppe, Inc. is a New Jersey corporation headquartered at 2101 9lst Street, North Bergen, New Jersey. Vitamin Shoppe is a retailer of nutritional products and sports supplements as well as herbs, homeopathic remedies, and beauty aids. The company currently sells its products through more than 500 stores located in 38 states and Puerto Rico, as well as through internet sales.

## FACTUAL ALLEGATIONS

15.     Vitamin Shoppe's Product labels clearly state that the Products provide benefits such as anti-catabolic effects, muscle recovery, and muscle growth[1]:

---

[1] BodyTech Creatine & Glutamine with Beta-Alanine product label: combines nutrients essential to most training regimens: Creatine helps to improve strength and performance during high intensity exercise and training. **Glutamine helps support muscle growth and recovery** as well as immune health. Beta-Alanine helps support muscle strength, endurance and overall athletic performance.

Bodytech BCAA & Glutamine states, "Also added is **glutamine for its anti-catabolic properties** and antioxidant Vitamin C."

Bodytech Glutamine states, "**Anti-Catabolic & Recovery Agent**" and "L-Glutamine is the single most abundant amino acid in the human body. It is involved in regulating protein synthesis and **has been shown to possess Anti-Catabolic properties to help preserve muscle.** Intense exercise can deplete glutamine stores, however, **supplemental glutamine is thought to replenish these stores allowing for enhanced recovery**."

4







16.    Vitamin Shoppe's recovery, muscle, and anti-catabolic claims however, are patently false according to numerous scientific research papers, as contained herein.

17.    "Recovery" in bodybuilding is the process in which fatigued muscles recuperate and grow after resistance training.

18.    "Anti-catabolic" refers to the ability of a product to prevent or minimize the breakdown of earned muscles during a workout.

19.    In one study, glutamine failed to affect muscle protein kinetics of the test subjects.[2]

---

[2] Gore D., Wolfe R. Glutamine supplementation fails to affect muscle protein kinetics in critically ill patients. JPEN J Parenter Enteral Nutr, 2002, 26:342-49.

20.     In a study involving healthy humans, glutamine was continuously infused for 2.5 hours at a rate corresponding to 0.4 grams/kg, which revealed that glutamine supplementation did not stimulate muscle protein synthesis.[3]

21.     Another study investigated the effect of L-Glutamine supplementation on the plasma and muscle tissue glutamine concentrations of exercise-trained rats, both immediately and three hours after a single exercise session until exhaustion. In that study, rats were subjected to 60 minutes of swimming exercise daily for six weeks. During the final three weeks, one group was given a daily dose of L-Glutamine (1 gram/kg). The plasma and muscle glutamine levels were higher than placebo during the post-exhaustive recovery period; however, this increase had no effect on the exercise swim test to exhaustion performance, which means that elevations in plasma and muscle glutamine levels have no benefit on muscle performance.[4]

22.     An additional study was also conducted to assess the effect of oral glutamine supplementation combined with resistance training in young adults. Subjects received either placebo (0.9 grams/kg fat-free mass/day of maltodextrin) or L-Glutamine (0.9 grams/kg fat-free mass/day) during six weeks of resistance training. Results showed that muscle strength, torque, fat-free mass, and urinary 3-methyl histidine (a marker of muscle protein degradation) all significantly increased with training, but were not different between the groups. This study demonstrated that L-Glutamine supplementation during resistance training had no significant

---

[3] Svanberg E., Moller-Loswick A., Matthews D., Korner U., Lundholm K. The effect of glutamine on protein balance and amino acid flux across arm and leg tissues in healthy volunteers. Clin Physiol, 2001, 4:478-89.

[4] Rogero M., Tirapequi J., Pedrose R., Castro I., Pires I. Effect of alanyl-glutamine supplementation on plasma and tissue glutamine concentrations in rats submitted to exhaustive exercise. Nutrition, 2006, 22:564-71.

effect on muscle performance, body composition, or muscle protein degradation in young, healthy adults.[5]

23.     Moreover, a study was performed to examine the effects of a combination of effervescent creatine, ribose, and glutamine on muscle strength, endurance, and body composition in resistance-trained men. Subjects performed resistance training while ingesting either a placebo or an experimental supplement (5 grams of creatine, 3 grams of glutamine, and 2 grams ribose) for eight weeks. Both groups significantly improved muscle strength, endurance, and fat-free mass, yet the groups were not significantly different from one another. Therefore, the experimental supplement, which included glutamine, was no more effective than placebo in improving skeletal muscle adaptation to resistance training.[6]

24.     Another study sought to determine the effects of eight weeks of creatine monohydrate and glutamine supplementation on body composition and performance measures. Subjects were randomly assigned to receive either placebo for eight weeks, creatine monohydrate (0.3 grams/kg/day for one week and then 0.03 grams/kg/day for seven weeks), or the same dose of creatine in addition to 4 grams of glutamine per day while engaged in a resistance training program. Body mass and fat-free mass increased in the creatine and creatine + glutamine groups at a greater rate than with placebo. Additionally, the two experimental groups underwent a significantly greater improvement in the initial rate of muscle power production compared to placebo. These results suggest that the creatine and creatine + glutamine groups

---

[5] Candow D., Chilibeck P., Burke D, Davison K., Smith-Palmer T. Effect of glutamine supplementation combined with resistance training in young adults. Eur J Appl Physiol, 2001, 86:142-49.

[6] Falk D., Heelan K., Thyfault J., Koch A. Effects of effervescent creatine, ribose, and glutamine supplementation on muscle strength, muscular endurance, and body composition. J Strength Cond Res, 2003, 17:810-16.

were equally effective in producing skeletal adaptation to resistance training and that glutamine apparently had no preferential effect in augmenting the results.[7]

25.     One study was performed to determine if high-dose glutamine ingestion affected weightlifting performance. In a double-blind, placebo-controlled, crossover study, resistance trained men performed weightlifting exercises one hour after ingesting placebo (calorie-free fruit juice) or glutamine (0.3 g/kg) mixed with calorie-free fruit juice. Results demonstrated no significant differences in weightlifting performance (maximal repetitions on the bench press and leg press exercises), indicating that the short-term ingestion of glutamine did not enhance weightlifting performance in resistance-trained men.[8]

26.     Similarly, another study sought to determine whether glutamine ingestion influenced acid-base balance or improved high-intensity exercise performance. Trained males performed five exercise bouts on a cycle ergometer at 100% of maximal oxygen consumption. The first four bouts were 60 seconds in duration, while the fifth bout was continued to fatigue. Each bout was separated by 60 seconds of recovery. The exercise bouts were initiated 90 minutes after ingesting either placebo or 0.3 grams/kg of glutamine. Results showed that blood pH, bicarbonate, and lactate, along with time to fatigue, were not significantly different between

---

[7] Lehmkuhl M., Malone M., Justice B., Trone G., Pistilli E., Vinci D., Haff E., Kilgore L., Haff G. The effects of 8 weeks of creatine monohydrate and glutamine supplementation on body composition and performance measures. J Strength Cond Res, 2003, 17:425-38.

[8] Antonio J., Sanders M, Kalman D., Woodgate D., Street C. The effects of high-dose glutamine ingestion on weightlifting performance. J Strength Cond Res, 2002, 16:157-60.

supplement conditions, indicating that the acute ingestion of L-Glutamine did not enhance either buffering potential or high-intensity exercise performance in trained males.[9]

27.     Another study determined whether oral glutamine, by itself or in combination with hyperoxia, influenced oxidative metabolism or cycle time-trial performance in men. Subjects ingested either placebo or 0.125 grams/kg of glutamine one hour before completing a brief high-intensity time-trial (approximately four minutes in duration). The results showed no significant difference in pulmonary oxygen uptake during the exercise test, thereby indicating no effect of glutamine ingestion either alone or in combination with hyperoxia. Thus, there was no limiting effect of the tricarboxylic acid intermediate pool size on oxidative metabolism or performance during exercise.[10]

28.     Defendant intended to and did use claims of "Anti-catabolic" "Muscle Growth" and "Muscle Recovery" to mislead consumers into believing the Products provided such benefits.

29.     Plaintiff reasonably believed these claims to mean Defendant's Products provided these benefits.

30.     Plaintiff and the Class members did not receive Products of the value Vitamin Shoppe promised those products would have. The lack of benefits provided to consumers by the Products fully diminishes the actual value of the Products.

31.     Plaintiff and Class members were deprived of the benefit of their bargained-for exchanges, and they suffered damages in an amount to be determined at trial.

---

[9] Haub M., Potteiger J., Nau K., Webster M., Zebas C. Acute L-glutamine ingestion does not improve maximal effort exercise. J Sports Med Phys Fitness, 1998, 38:240-44.

[10] Marwood S., Botwell J. No effect of glutamine supplementation and hyperoxia on oxidative metabolism and performance during high-intensity exercise. J Sports Sci, 2008, 26:1081-90.

32.     Plaintiff would not have purchased Vitamin Shoppe's Products had he known

they did not provide the health benefits as advertised on the label.

33.     Vitamin Shoppe's deceptive statements violate 21 U.S.C. § 343(a)(1), which

deems food misbranded when the label contains a statement that is "false or misleading in any

particular."

34.      The United States Food and Drug Administration (the "FDA") promulgated

regulations for compliance with the Federal Food, Drug, and Cosmetic Act (the "FDCA") and

the Dietary Supplement Health and Education Act (the "DSHEA") at 21 C.F.R. § 101, *et seq*.

Vitamin Shoppe's fabricated food Products are misbranded under 21 C.F.R. § 101, *et seq*.

35.     The introduction of misbranded food into interstate commerce is prohibited under

the FDCA.

36.     Under, Massachusetts law, products such as the Products are "misbranded" if

their "labeling is false or misleading in any particular" or does not contain certain information on

its labeling.  *See* Mass. ALM GL ch. 94 § 187.

37.     Massachusetts requires that all packaged food be labeled in compliance with

applicable law including all labeling requirements contained in 21 C.F.R. Part 101 - Food

Labeling.  *See* 105 CMR 590.001; 105 CMR 590.004(B); Mass. Food Code § 3-201.11.

Massachusetts does this "to safeguard public health and provide to consumers food that is safe,

unadulterated, and honestly presented."  *See* 105 CMR 590.001; 105 CMR 590.002; Mass. Food

Code § 3-101.11.  Massachusetts mandates that "[f]ood shall be safe, unadulterated, and, as

specified under [FC] § 3-601.12, honestly presented."  *See* Mass. Food Code § 3-101.11; 105

CMR 590.001.  Massachusetts Food Code § 3-601.12 provides that "[f]ood shall be offered for

human consumption in a way that does not mislead or misinform the consumer. *See* Mass. Food Code § 3-601.12; 105 CMR 590.001.

38.     The introduction of misbranded food into interstate commerce is prohibited under the FDCA and Massachusetts law.

39.     Plaintiff and Class Members would not have purchased the Products, or would have not paid as much for the Products, had they known the truth about the mislabeled and falsely advertised Products.

## JURISDICTION AND VENUE

40.     This Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1332(d). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which some members of the Classes are citizens of States other than the State in which Vitamin Shoppe is incorporated and has its principal place of business.

41.     Diversity jurisdiction exists because Plaintiff is a citizen of Massachusetts and Vitamin Shoppe is a citizen of New Jersey.

42.     This Court has personal jurisdiction over Vitamin Shoppe because it conducts business in Massachusetts. Vitamin Shoppe has marketed, distributed, and sold the Products in Massachusetts. Vitamin Shoppe has sufficient minimum contacts with this State, and/or

sufficiently avails itself to the markets of this State through its sales and marketing within this State to render the exercise of jurisdiction by this Court permissible.

43.     This Court has personal jurisdiction over Vitamin Shoppe because it has continuous and systematic contacts with Massachusetts. Vitamin Shoppe owns and operates numerous retail stores in this District and regularly sells its products to Massachusetts's residents.[11] Further, in addition to selling the Products in its retail stores, this Court has personal jurisdiction over Vitamin Shoppe because its Internet website allows consumers to order and ship the Products anywhere in the United States, including in this District. Vitamin Shoppe conducts business throughout the United States, including in the State of Massachusetts and in this District.

44.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (c) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Venue is also proper under 18 U.S.C. § 1965(a) because Vitamin Shoppe transacts substantial business in this District.

## CLASS ACTION ALLEGATIONS

45.     Plaintiff brings this suit as a class action on behalf of himself and all other similarly situated customers pursuant to Fed. R. Civ. P. 23. Plaintiff seeks to represent the following Class:

> **National Class:** All persons in the United States who purchased, not for resale, the Products. Excluded from the Class are Defendant, their officers and employees, affiliates and any entity in which Defendant has a controlling interest. Also excluded are any Judge or Magistrate presiding over this or any related action and members of their families; all persons who properly execute and file a timely request for exclusion from the Class;

---

[11] *See* https://www.vitaminshoppe.com/sl/massachusetts (Last visited March 8, 2017).

**State Subclass:** All persons in the State of Massachusetts who purchased the Products.

46.     The exact number of Class members is unknown as such information is in the exclusive control of the Defendant. Plaintiff, however, believes that the Class encompasses hundreds of thousands of individuals throughout the United States. Therefore, the number of persons who are members of the Class described above are so numerous that joinder of all members in one action is impracticable.

47.     Questions of law and fact that are common to the entire Class predominate over individual questions because the actions of Defendant complained herein were general applicable to the entire Class:

48.     These legal and factual questions include but are not limited to:

   a.   Whether Defendant knew or should have known its statements regarding the benefits of the Products were false and/or misleading;

   b.   Whether Defendant intended to mislead and/or deceive Plaintiff and Class members about the true benefits of the Products;

   c.   Whether Defendant breached an express warranty to Plaintiff and Class members;

   d.   Whether the Products failed to perform in accordance with the reasonable expectations of ordinary consumers;

   e.   Whether the Products fail to perform as advertised and warranted or expected by an ordinary consumer;

    f.   Whether Defendant's conduct in marketing and selling the Products involved misrepresentations, intentional omissions, or was otherwise unfair and deceptive;

    g.   Whether Defendant breached any implied warranties to Plaintiff and Class members;

    h.   Whether Defendant has been unjustly enriched;

    i.   Whether Plaintiff and Class members suffered damages as a result of Defendant's misconduct as described herein and, if so, the proper measure of damages;

    j.   Whether Plaintiff and the Class are entitled to compensatory, exemplary and statutory damages, and the amount of such damages;

    k.   Whether Defendant should be declared financially responsible for notifying all Class Members about the true nature of the Products.

49.    Plaintiff's claims are typical of those of other Class members because Plaintiff and all Class members were injured by the same wrongful practices of the Defendant as described in this Complaint. Plaintiff's claims arise from the same practices and course of conduct that gives rise to the claims of all Class members, and are based on the same legal theories.

50.    Questions of law or fact common to the Class members predominate and a class action is superior to other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all Class members is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by Class members are likely to be in the millions of dollars, the individual damages incurred by each Class member resulting

15

from Defendant's wrongful conduct are, as a general matter, too small to warrant the expense of individual suits. The likelihood of individual Class members prosecuting separate individual claims is remote and, even if every Class member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials on the same factual issues. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action and certification of the Class under Rule 23(b)(3) is proper.

51. Plaintiff has no interests that are contrary to or in conflict with those of the Class he seeks to represent.

52. As a matter of public policy, this consumer matter should proceed as a consumer class action that will produce several salutary byproducts, including:

    a. A therapeutic effect upon those sellers who indulge in deceptive practices;

    b. Aid to legitimate business enterprises by curtailing illegitimate competition; and

    c. Avoidance to the judicial process of the burden of multiple litigation involving identical claims.

53. Defendant has acted or refused to act on grounds generally applicable to all members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with regard to Class members as a whole and certification of the Class under rule 23(b)(2) proper.

## COUNT I
### Untrue and Misleading Advertising Under Massachusetts G.L. c. 266 §91
### On behalf of the Massachusetts Subclass

54.     Plaintiff re-alleges and incorporates by reference the allegations contained in all preceding paragraphs as though set forth fully herein.

55.     Defendant's labeling, advertising, marketing, and promotion of the Products is untrue, deceptive and misleading, in violation of G.L., c. 266, §91.

56.     At all times relevant, Defendant knew or, upon reasonable investigation, could have ascertained that its labeling, advertising, marketing, and promotion of its Products was untrue, deceptive, and misleading.

57.     Defendant's untrue, deceptive, and misleading labeling, advertising, marketing, and promotion of the Products has continued throughout the Class period, and is continuing as of the present date.

58.     As a purchaser of the Products who was injured by Defendant's false and misleading advertising (in that Plaintiff and other Class members purchased products that did not conform to the representations made about them by Defendant as set forth above), Plaintiff is entitled to and does bring this class action to seek all available remedies under G.L. c. 266, §91, including injunctive relief.  The injunctive relief would include an Order directing Defendant to cease its false and misleading labeling and advertising, retrieve existing false and misleading advertising and promotional materials, and publish corrective advertising.

59.     Plaintiff has suffered injury in fact as a result of Defendant's conduct because he purchased the Products.

## COUNT II
### Violation of Massachusetts ALM GL ch. 94 §§ 187 and 190 and 105 CMR 590.001 *et seq*.
### On Behalf of the Massachusetts Subclass

60.     Plaintiff re-alleges and incorporates by reference the allegations contained in all preceding paragraphs as though set forth fully herein.

61.     All containers of the Products are misbranded.

62.     Massachusetts ALM GL ch. 94 § 187 provides that: "Food shall be deemed to be misbranded: . . . If its labeling is false or misleading in any particular . . . If its container is so made, formed, colored or filled as to be misleading . . . If any word, statement or other information required by or under authority of this chapter to appear on the label or labeling is not prominently placed thereon with such conspicuousness, as compared with other words, statements, designs, or devices, in the labeling, and in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use."

63.     Massachusetts requires that all packaged food be labeled in compliance with applicable law including all labeling requirements contained in 21 C.F.R. Part 101 - Food Labeling. *See* 105 CMR 590.001; 105 CMR 590.004(B); Mass. Food Code § 3-201.11. Massachusetts does this "to safeguard public health and provide to consumers food that is safe, unadulterated, and honestly presented." *See* 105 CMR 590.001; 105 CMR 590.002; Mass. Food Code § 3-101.11. Massachusetts mandates that "[f]ood shall be safe, unadulterated, and, as specified under [FC] § 3-601.12, honestly presented." *See* Mass. Food Code § 3-101.11; 105 CMR 590.001. Massachusetts Food Code § 3-601.12 provides that "[f]ood shall be offered for human consumption in a way that does not mislead or misinform the consumer. *See* Mass. Food Code § 3-601.12; 105 CMR 590.001.

64.     All labeling of the containers of the Products is false and misleading.

65.     All containers of the Products are made as to be misleading.

18

66.     All containers of the Products are misbranded.

67.     Massachusetts ALM GL ch. 94 § 190 bars the manufacture, sale, delivery, or offer of delivery of misbranded food.

68.     Plaintiff and the Massachusetts Class purchased misbranded containers of the Products.

69.     Plaintiff and the Massachusetts Class members would not have purchased the Products had they been aware that they were misbranded.

70.     Plaintiff and the Massachusetts Class members were harmed as a result of the purchase of the Products and are entitled to damages, including the amounts spent on the Products and punitive damages.

**COUNT III**
**BREACH OF EXPRESS WARRANTY**
**On Behalf of the National Class and the Massachusetts Subclass**

71.     Plaintiff re-alleges and incorporates by reference the allegations contained in all preceding paragraphs as though set forth fully herein.

72.     Plaintiff and the National Class members formed a contract with Vitamin Shoppe at the time they purchased the Products. The terms of the contract included the promises and affirmations of fact made by Defendant on the Products' packaging and through marketing and advertising, as described above. This labeling, marketing and advertising constitute express warranties and became part of the basis of the bargain, and are part of the standardized contract between Plaintiff and the members of the National Class and Defendant.

73.     Defendant labeled, distributed, marketed, promoted, sold and otherwise released into the stream of commerce, its Products as described herein, to consumers, including Plaintiff.

19

74.     Defendant breached its express warranties about the Products because Defendant's statements about the Products were false and the Products do not conform to Defendant's affirmations and promises described above.

75.     As a direct, foreseeable and proximate result of Defendant's breaches of express warranties, Plaintiff and National Class members suffered economic losses when Plaintiff and Class members purchased the Products in reasonable reliance upon the express warranties.

### COUNT IV
### BREACH OF IMPLIED WARRANTY
**On Behalf of the Implied Warranty Multi-State Class and Massachusetts Subclass[12]**

76.     Plaintiff re-alleges and incorporates by reference each of the allegations contained in all of the preceding paragraphs of this Complaint as though set forth fully herein.

77.     Plaintiff asserts this cause of action on behalf of himself and the Class members.

78.     The Products are goods and Defendant is a merchant with respect thereto, within the meaning of the Uniform Commercial Code, as adopted in Massachusetts.

---

[12] The States in the implied warranty multi-state class is inclusive of all states with similar implied warranty laws under the facts of this case, excluding only the States of South Carolina and Louisiana, but also including the District of Columbia.

79.     Defendant developed, manufactured, distributed, marketed, advertised, and/or sold the Products directly to or for the purpose of their eventual sale to end users for consumption.

80.     Defendant impliedly warranted to Plaintiff and Class Members, prior to their purchase of the Products, that the Products were merchantable and reasonably fit for the purposes for which such products are used, and that the product be acceptable in trade for the product description.

81.     Plaintiff and Class Members relied on Defendant's skill and judgment in selecting Defendant's product to purchase.  Moreover, Plaintiff and Class Members relied on statements made on Defendant's packaging, container, and/or label, that the Products provide benefits such as anti-catabolic effects, muscle recovery, and muscle growth.

82.     Defendant breached its duty by selling to Plaintiff and Class Members Products that were not merchantable.  In fact, the Products are unfit for their intended use and not of merchantable quality, in that they do not provide anticatabolic, muscle recovery, and muscle growth benefits.

83.     The Products are unfit for their ordinary purpose and of nonmerchantable quality because they do not conform to the promises and/or affirmations of fact found on the Products' containers or labels.

84.     Defendant breached its implied warranties by including false promises or affirmations of fact on the Products' labels and/or containers.

**COUNT V**
**UNJUST ENRICHMENT**
**In the Alternative to Count III on Behalf of the National Class and Massachusetts Subclass**

85.     Plaintiff re-alleges and incorporates by reference the allegations contained in all preceding paragraphs as though set forth fully herein.

86.     Plaintiff and the National Class have unintentionally conferred substantial benefits on the Defendant by purchasing their Products.

87.     Defendant knew or should have known that the payments they received were given and received with the expectation that Plaintiff and the Class members were purchasing the Products with an expectation of receiving the advertised benefits.

88.     Because of Defendant's wrongful activities, they have unlawfully received Plaintiff and Class members' monies through corporate revenues, salaries and other financial benefits.

89.     Defendant, having retained the monies unjustly enriched them, should be required by the Court to account to Plaintiff and the Class for their unjust enrichment and the profits earned thereafter such monies.

90.     As a direct and proximate result of Defendant's wrongful conduct and unjust enrichment, Plaintiff and Class members have suffered damages in an amount to be determined at trial.

91.     Defendant should be required to disgorge all monies, profits and gains which they have obtained or will unjustly obtain in the future at the expense of Plaintiff's and National Class members'.


**<u>PRAYER FOR RELIEF</u>**

92.    WHEREFORE, Plaintiff prays that this case be certified and maintained as a class action and for a judgment to be entered upon Defendant as follows:

    A. Appointing Plaintiff as the representatives of the Class and his counsel as Class counsel;

    B. For economic and compensatory damages on behalf of Plaintiff and all Class members;

    C. For actual damages sustained;

    D. For treble damages pursuant to law, and all other actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiff and Class members are entitled;

    E. For injunctive relief, compelling Defendant to cease their unlawful actions and to account to Plaintiff for their unjust enrichment;

    F. For reasonable attorneys' fees, reimbursement of all costs for the prosecution of this action, and pre-judgment and post-judgment interest; and

    G. For such other and further relief this Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury on all issues within the instant so triable.

Dated: March 21, 2017               MIRABELLA LAW, LLC

                                   By: */s/ Erica Mirabella*

                                   Erica C. Mirabella

**MIRABELLA LAW, LLC**
132 Boylston Street, 5th Floor
Boston, MA 02116
Telephone: (617) 580-8270
Email: erica@mirabellaLLC.com

Nick Suciu III
**BARBAT, MANSOUR & SUCIU PLLC**
1644 Bracken Road
Bloomfield Hills, Michigan 48302
Telephone: (313) 303-3472
Email: nicksuciu@bmslawyers.com

Charles E. Schaffer
**LEVIN SEDRAN & BERMAN**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Telephone: (215) 592-1500
Email: cschaffer@lfsblaw.com

Charles J. LaDuca
Beatrice Yakubu
**Cuneo Gilbert & LaDuca, LLP**
4725 Wisconsin Avenue NW
Suite 200
Washington, D.C. 20016
Telephone: (202) 789-3960
Email: Charles@cuneolaw.com
          byakubu@cuneolaw.com

*Counsel For Plaintiff*
*And The Proposed Putative Classes*

24